The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. All right, please be seated. All right. United States v. Lawrence and Mr. Bryant. Thank you. Good morning, your honors. May it please the court, my name is Patrick Bryant, representing Derickson Lawrence in this appeal. As time permits, I'd like to discuss each of the issues that we've presented in our briefs. But I'd like to first discuss our severance argument. The district judge erred in joining for trial count 11 with the other 10 counts. Mr. Lawrence was initially indicted in July of 2023 on counts related to the payroll fraud. Months later, the government superseded to add count 11 related to the PPP fraud. There's no direct relationship between those alleged schemes. Rule 8A provides that joinder is appropriate when the counts arise from a common scheme or plan, the same act or transaction, or have a same or similar character. That's not the case here. The only commonality of the alleged... But isn't severance a matter that's sort of ultimately as much as anything in the discretion of the district court, which is familiar with all the different claims and the nature of the different claims? Well, this court's review is de novo of the legal question of whether these... No, it's not. This court's review is for abuse of discretion as to whether severance was warranted or whether it was not. I believe, Your Honor, respectfully that I recall from the Hawkins case from this court that the legal question of the application of the rule 8A, whether these schemes fit within the language of the rule, I believe is a legal issue. And the district court certainly has some power and is more familiar with the case. I mean, although at this stage, it's only looking at the indictment. And so it doesn't have any familiarity beyond the mere allegations. Just to follow up, Judge Wilkinson, I think, is right in terms of the severance question. Whether it severs join cases is, I think, plainly abuse of discretion. Your argument, I think, relates to the joinder in the first place, which may be a legal question. Yes, I guess that's correct. And to clarify, 8A is the legal question about whether joinder is appropriate. If joinder is appropriate, then Rule 14 discusses whether it still should be severed due to prejudice. I think that probably is a discretionary decision. But either way, under either analysis, we think the district court erred. The only commonality of these schemes is Mr. Lawrence, and that's too high a level of generality. Simply any fraud allegedly committed by the same defendant is not necessarily joinable in the same trial. But you have an argument, but that's not your argument, right? Nobody thinks the only thing that relates between these two things is the person, right? Grapple a little bit with what the similarities are. It's not just the person, right? So he commits a massive fraud against a company that causes his company to effectively go defunct. He then tries to fill that gap with the PPP. They're all involving the same entity. They would involve the same witnesses or many of the same witnesses that would testify. I mean, that might not be enough, but when you make the argument and say the only thing that connects them is one person, you just fail to grapple with the hard question that might be here. I'm not saying it's not a hard question, but you don't help me at least without discussing and thinking about the sort of temporal connection, the entity connection, and the government's argument that they were, in fact, connected because the PPP fraud follows after he's lost everybody's money and that he does them in very similar ways, right? He wires the money from both frauds through the same account. He's using them in the same illicit manner. I mean, to say it's just one person, like, I think sort of misses the point. Well, I understand that contention. Here's why I disagree with that. The government's own charging document separates these in time. The original fraud, the government says, ended no later than December of 2019. The PPP fraud didn't arise until April or May of 2020, and so the temporal connection is really only just one after the other. It's not that they overlap in time. I understand that, but that is a temporal connection, right? Well, it's more distinct than a temporal connection. In Hawkins, there were only 17 days apart, and this court said that that was distinct. A lot of this problem is handled through instructions, and the district court had a very explicit instruction that each count was to be considered separately, and I think we generally follow the rule that the jurors take district court instructions seriously, and to me, this quintessentially boils down to a question of trial management where the district court has a valued perspective, and as Judge Richardson pointed out, there's just a lot of reasons to avoid the cost of severance, and the cost of severance, you're going to have to have these witnesses that are going to be dragged in for a second time, and you're going to have to impanel another jury and all the rest, and it's going to be an additional drain on judicial resources, and that might be fine in some cases, but not in a situation where the same company, Market View, was used to conceal what he was doing with his employees' funds, and it was the same company, it was the same methods employed, it was the same intermediary bank account that was concealing things, and the nature of the fraud was the same. This gentleman was taking funds from his employees, most of whom were restaurant workers and were living a lot closer to the line than the defendant here, and he was taking their funds, and he was misrepresenting the kind of investments that were going to be made with those funds, and he invested in options trading, which we all know has the highest element of risk. At the same time, he was telling his employees that they were all in safe money market funds, and then he lied to them about the fact that he was taking their money and investing it in an entirely more reckless vehicle than what he represented to people whom I say again, many of whom are living close to the line, and he was doing this with the very same strategy and company and means that was present in all of the accounts. It was present throughout in those accounts, and I think that there is a large discretionary element involved with this, and I honestly thought it was a good trial. I thought it was a well-run trial, and the jury smoked it all out and said that it wasn't some kind of bad business judgment or breach of contract or whether it was out-and-out fraud, and the jury smoked it out, and that was true for one count, and it was true for all of them, including the PPP application in count 10 or whatever it was, but I think there's a great deal more commonality than you're admitting, and I think Judge Richardson pressed you on that point, and I didn't see that it was a very, I think it's a difficult one. Well, I understand that position, but I think that the one distinction is that there's a distinct method, a problem with the method, that one is money that he has a right to that he might be misusing versus money that he doesn't have a right to that he's obtaining by false pretenses from the government, and so I think that's a distinction, and Hawkins was a case where even though there was a curative instruction and even though there was overlap in the evidence, this court still held that there was misjoinder. I think that the evidence does not overlap as much as the government says. The PPP fraud would have been very discreet, and to the extent that it's easy to parse these apart, and if it's so easy for the jury to differentiate between the alleged schemes, that makes it easier to have a separate trial. In this particular issue, you overturn a district court on a question of joinder and severance of counts, and you have a case like this, and then you have 15, 20, 30 cases following in its wake, and that's what we let ourselves in for, and at any rate. Well, I don't think that that's been the case after Hawkins, and I understand the court's position on that. With the time I have remaining as I'm winding down here, I'd like to move to our sentence argument about the application for the enhancement for the use of sophisticated means. The commentary to the guideline says that that enhancement should only apply when the offense involves especially complex or especially intricate means, which presupposes that there are going to be some offenses that could be characterized as complex or intricate that still do not qualify for the enhancement. It must be more than the complexities inherent in the fraud itself, and here all that we've seen. That's in the commentary? Yes. Is sophisticated means ambiguous? We haven't made an argument along those lines or that there should not be deference to the commentary. We think the commentary helps us because it clarifies that it has to be something over and above, so I think I understand where you're going with that. My point there is I think the law is, after Kaiser at least, that we don't go to the commentary unless the guidelines are ambiguous. And sophisticated, maybe it meets the commentary. I think there's a, you know, I'm not sure there's a clear error that it's not, but I'm not sure it's just not in the first instance a sophisticated means in terms of the way you could look at the array of criminal activity. Well, I understand. So even if you just take the generic term sophisticated and you ask the question was this a sophisticated offense, I still don't think it would apply, because all we're talking about here is dumping money into one account and then moving it into another account. That's my standard view on this issue. I think it would be clear error because it's a factual finding. We're not getting into the legal terminology. But the district court's findings at 1245 and 1246 of the appendix are very minimal and really says that anything beyond just taking money out of the cash register would be considered sophisticated. Is that fair? I mean, I don't know that he said anything beyond that is sophisticated. I think he was saying here's something that's not, here's something that is. I mean, I don't think that's entirely fair. Well, that's all we have to go on is what's in the transcript. And he says this was sophisticated and unsophisticated fraud is taking money out of the cash register. And I think that's just the only logical inference is that he thinks that, well, at a minimum there's a huge gulf and somewhere we end up along. I would note it's almost in the nature of an aside. But I would note your client had an MBA in international finance. That's correct. He was certainly capable of employing very sophisticated means if that's what he set out to do. And when you look at that chart, it's from a layman's perspective. It looks pretty sophisticated and complicated to me. Well, I understand. But the Adepoju case from this court specifically rejected the contention. The district court in that case said, well, this is something that an ordinary person couldn't do. You needed some expertise to do this. And this court said that's not the standard. It has to be something that is over and above, more complex. Well, this is more complex. I mean, the district court, as I recall, made a statement and I'm quoting it. He said this whole scheme is, quote, impossible to understand. I mean, he's looking at this chart. He's having the same reaction I am. The district court is saying this is impossible to understand without a whole lot of work. And I'm saying to myself, hey, that's where I am, too. And this was, it really is quite complex. Just the trail that this money was blazing in through these different accounts and these different subterfuges. If I can respond to that briefly. Yeah, absolutely. I think that that's still, it was still traceable. It doesn't make it especially complex, especially because if you look at the comparator language that's in the guideline about phony entities, phony businesses. And again, the Adepoju case had identity theft and forged instruments. Help me understand. The Adepoju case obviously relies on Stinson and the suggestion that the commentary is binding. That is no longer the law in the Fourth Circuit. And so I guess I'm having a little hard time understanding how I, like, do anything with Adepoju, given that we no longer follow Stinson. Well. I mean, you agree with the premise, right? Yes, that's correct. So the reasoning that's given here is to quote the commentary and then apply the commentary. Well, we sort of now know that's not what we do. So, I mean, I understand you want to go to it because you like the result. But how am I supposed to apply a case that's now based on reasoning that's been, like, squarely rejected by this court? Well, I think my response to that would just be that even if you just rely on the guideline itself, we don't consider this sophisticated because there's nothing beyond an ordinary fraud offense, unless there are questions there. I would say, you know, there's sort of a sad dimension to this case because it relates to the sophisticated means part. But the people that are being defrauded, again, many of their restaurant workers, and many of them don't have the advantage of the education that your client does. They certainly don't have degrees in international finances. That may not be true of all, but some everyday hardworking, honest folks who are being taken advantage of in a very basic way by somebody who had the advantage, all the advantage of an advanced degree, and he's using his education to deprive hardworking people of their hard-earned retirement. And it's a sad thing when people with means in education prey upon people with less advantages. Maybe that's not true in the case of all the employees, but it's bound to be true of some of it. And I think that that kind of predation is a very, very sad thing. And I think the jury saw it. It's not how I see it. It's where the jury saw it. But I think this is what the jury saw, and I think they darn well didn't like it. Well, I understand the court's concern, and our position is that there are still grounds to reverse the conviction and vacate the sentence. Thank you. Good morning. Anthony Mosey for the United States. May it please the Court. Your Honor, Defendant Appellate Derrickson Lawrence asked this Court to overturn his conviction after a jury trial for stealing the salaries of restaurant employees that were entrusted to him in his role as the CEO and sole owner of Market View. To follow my colleague's organizational structure, I'd like to start with the severance issue and then briefly touch upon both the sufficiency of the evidence claim and conclude on the sophisticated case. When you say severance, are you starting with Joinder? Yes, Your Honor. There are sort of two issues here that Your Honor, Judge Quattlebaum identified. The first is Rule 8, Miss Joinder. That's a de novo review. Then I want to touch briefly on harmlessness or any prejudice the defense talked about. And finally conclude on Rule 14, severance, which is an abuse of discretion review. As to the Miss Joinder argument, Your Honors, there was a common scheme or plan, and at the very least, these were of a same or similar character. The analogy here is that the defendant had complete control over his company, Market View, and he had access to two separate pots of money with which he promised to do very specific things. So for the employee's salaries, he said, I'm going to keep these things safe, and I'm only going to make specific kinds of investments. What he did in actuality and what the jury heard at trial was that he funneled those through an intermediary account, this Wells Fargo 7523, and then transferred them to make options trades in his own personal brokerage account and then used that money when he had some success, which was limited, to sort of fund his own personal expenses. The challenge with this is the argument at that level of generality suggests that any fraud claims can be brought. But what we've got here, as your colleague pointed out, is fraud that's happening on two different ends. The PPP fraud is the fraud in the acquisition of the money. It didn't matter if he then actually gave it to employees because he was fraudulent in getting it. So it didn't matter how he used that money. All that matters was the fraud on the front end where the employee fraud was on the back end, right, and the misuse of that money. And so if we say it doesn't really feel like it's the same plan or scheme, right? One is fraud on the front and the other is fraud on the back. If we can just let in any fraud, then Rule 8 doesn't, like, do much, does it? Well, respectfully, your Honor, what he did with the money that he received for the Paycheck Protection Program goes to his intent when he was making that application. It might be evidence, but it's not the actual, like, offense, right? The offense was in the application. His fraud was complete when the application was made, right? That's correct, your Honor. So the point is it doesn't matter what he does with the money. That's not true of the other fraud, right? So the fraud only exists once he misuses the money, right, to engage in trades that were improper. Fair, your Honor. I do think it's worthwhile to highlight that the government's indictment charges only these statements and wire frauds that he was making in 2018 to 2019. And at that point, he is taking the money. Yeah, but to follow up on that, the representations may have been earlier in terms of the fraud with the employees. But the, you know, damages and conduct, which are all part of that, you know, that's all, that's way more intertwined with, the post-acquisition of money is way more central to the first fraud than the second. That's fair, your Honor. There were continuing misrepresentations to the employees. So, for example, he maintained a website where they could access what was purportedly in all their individual accounts. What if he goes and robs a bank and sticks the money in the same accounts and, you know, goes through the same accounts to the other and ended up being invested in day trading or whatever he's doing? I mean, would that be the same? We're using the same accounts, same guy, starting in the same business account. You know, you're going to trace all that stuff. I mean, why wouldn't that be, you know, joinable if, you know, under your thinking? I apologize, your Honor. The way that I conceive of the case is if you were robbing a bank and then you decided to rob a 7-Eleven, there are obviously different sources of the money. No, I'm talking about in this case, he robs a bank but sticks the money in the same, I mean, part of your argument is he's using the same accounts, you know, going through the same financial process with the proceeds of his crime. And as I read your brief, that was one of the things that you used to say similar conduct or similar scheme. And you could do that if you got the money by robbing the bank as opposed to some financial fraud. That's correct, your Honor. I do think the government's stronger argument here is that there are similar character as to these two separate thefts, both the paycheck protection fraud and the stolen money from the salaries from the Golden Corral employees. I think, certainly, if this court were to find that that was sufficient, it doesn't need to reach the question of whether or not these were the same scheme or plan. Could you, I'm sorry, Judge Rose, were you about to? I would like to hear your, I mean, I think this is an interesting question, this Joinder question. I appreciate your arguments as I appreciate your colleagues. I am interested in your harmlessness. If we were to assume misjoinder, and let me just say, I mean, I think on the abuse of discretion of severance, I think that's pretty, you know, not an abuse of discretion. But how do you say it's harmless if it was a misjoinder? A couple of reasons, your Honor. So the indicia here under this court standard in Mackens includes whether or not the evidence of guilt was overwhelming and the concomitant effect of any improperly admitted evidence. Here, your Honor, there was overwhelming evidence of both of these separate schemes. Obviously, the stealing of the employee's salaries was a little bit more sophisticated and required more understanding, but the financial analyst who testified, I think, made it fairly clear, and the jury saw, that this wasn't a case where someone was investing. He was taking the money. Investing implies that the principles, in some instances, would have been transferred to the investment account and that that principle would have been transferred back. The evidence at trial, in fact, is that there was only one transfer out of the brokerage account during the two-year time period for about $10,000. In contrast, there was about $200,000 that was transferred to that brokerage account. Do you think if they had been non-joindered that the PPP trial could have included what I call the employee fraud as 404B evidence? Yes, your Honor. There would have been substantial overlap in the witnesses the government would have called. So first, Mr. Ellsworth, who was Marketview's only employee other than a defendant, would have been called to testify. That's a different issue. Maybe I've cut you off too soon, but I don't think he's asking about same witnesses. 404B is a prior bad act that would be admissible in a second trial. So imagine we've got two trials. We've convicted on the employee fraud and we now have the PPP fraud, and the government goes to the court and says, we want to introduce evidence of the employee fraud as 404B evidence, right? Evidence that goes to the motive and means of the defendant. Would it be admissible? Yes, your Honor. And tell me why, which I don't think has anything to do with the same witnesses. So I apologize. I was jumping ahead, your Honor. But yes, the witnesses sort of reflect the 404B evidence. So he was without any source of income after Marketview collapsed in 2019 because Golden Corral no longer was transferring this $80,000 or so every two weeks to him. In fact, there was evidence at trial that he reached out again in 2020 to the CFO, trying to sort of gin up more business. So this goes to his intent. The reason why he was doing the paycheck protection fraud, he literally had no money at that point. Also, the fact that he was in debt to them, as he knew by several hundred thousands of dollars, again, go to why he felt the need to sort of misrepresent this and get this money. Let me ask you one further question here with respect. Even if there was a misjoinder or abuse, and let's say the misjoinder, we look at it de novo or what have you. But the fact that the standard of review is de novo doesn't mean that misjoinder is a structural error. It would still be subject to a harmless error analysis. And there's no other way to go on a harmless error analysis but to look at the evidence of guilt with regard to the particular account that the defendant claiming here was the subject of a misjoinder. In other words, the fact that there's a de novo standard of review does not mean that it is a structural error in the system and that it's immune from any kind of harmless error analysis. And you point out that the evidence on this account was pretty doggone well overwhelming. And what I'd like you to do, because I think it does pertain to harmless error analysis, if indeed there was an error at all, why don't you just talk briefly about just how much evidence was introduced on this point? Yes, Your Honor, and I think this is going to the sufficiency argument a bit as well, talking about the overwhelming evidence of the defendant's intent to defraud. I think the Supreme Court has been very reluctant to say that this category of error and this category of error is a structural error and immune from harmless error analysis because the whole idea that Justice Rehnquist posed that you're entitled to a fair trial, but you're not entitled to a perfect one. And I'm sorry because I cut you off, but I want you to talk about just how overwhelming the evidence was with respect to this particular account. With respect to the paycheck fraud, Your Honor? Yes. Yes, Your Honor. So the evidence at trial showed that the defendant had taken hundreds of thousands of dollars. That's count 10, is it not? Counts 1 through 10, I believe, Your Honor. Count 11 is the paycheck protection fraud. That he had taken hundreds of thousands of dollars out. He was aware that that account had insufficient funds to cover transactions as early as January of 2019. There was an email where he actually acknowledged lending about $30,000 out of that pooled account to his spouse and saying that he was in a hole at that time period. Again, the cardholder agreement never allowed him to make loans to other people based on that information. In addition, Your Honor, although the defense focuses quite a bit on the language in the cardholder agreement, that actual language foreclosed the sort of risky options trading that the defendant was doing. That was the expert that the United States called at trial. The language specifies that he had to invest the money in money market funds that had been secured by U.S. Treasury obligations. And as the expert testified, in the history of our country, there has never been a negative return for those sorts of investments. They've never lost funds. In contrast, the defendant was investing in options. And even if he didn't have an MBA, and even if he wasn't a sophisticated individual, he should have known that these- Your colleague, if I'm remembering this correctly, I may have the wrong case. There was a mistrial, though, right? No, Your Honor. There was no mistrial here? No mistrial in this case.  Okay. The jury came back rather quickly, actually, Your Honor. An additional factor that makes this a particularly unsavory business, and that is on the few instances where his options trading resulted in some gains, he never put those back into the employee's accounts. He kept them for himself, even after the options trading on the rare occasions where the options trading resulted in some profit. What did he do with them? He kept it for himself. He never returned it to the accounts where it rightfully belonged. And I come back to the harmlessness point and not holding this to be structural error, if indeed there was error. But in addition to the overwhelmingness of the evidence, we always look to the way in which the case was submitted. And as I recall, and I don't have the language in front of me, but as I recall, the district court took pains to say that these are separate counts and they should be considered separately. And we always, we think that juries take district court instructions seriously. And when you look at the overwhelming nature of the evidence that's introduced on this count, and you look at the district court's instructions and everything, that should be enough, it seems to me, to find harmless error, if indeed there was error. And I think I've made my point on this, that this is not a structural situation. It is to start creating structural errors, that's a path of mischief. If I can respond to the two parts of your question, Judge Wilkinson. The first is about what he did with the funds when he did actually get a return. And these were exhibits that we put in front of the jury through the financial expert. It's Governments 803, which is Joint Appendix 7438, and 802, which is Joint Appendix 7422. And that showed the jury that the transfer of the funds out, transfer of a couple thousand dollars or so when he did make profits and didn't lose his shirt, and then what he did with it, including paying for his spouse's expenses, Home Depot, and his son's private education. Your second point, Your Honor, going to the issue of harmlessness, it's also telling that the defense only highlights two issues, really, of prejudice, that their client suffered as a result of the joinder. And those two issues, frankly, were first that he was forced to concede, really, the paycheck protection fraud. But the record reveals that the defense was using that offensively in an effort to get sort of a compromise verdict. In the closing argument, the defense called it a helpful comparison to look at the paycheck protection fraud, saying that's fraud, but what he did with respect to the salaries was not fraud. That's JA 963. Second, the defense argues that Mr. Lawrence faced risks if he chose to testify, that if he were to testify perhaps only on the paycheck protection fraud, the government would be able to cross-examine him on the salary fraud. The trial court was very careful. Immediately after it made its oral ruling about denying the motion for severance, the trial court said that he expected you all to be prepared to address the issue of limiting cross-examination when it comes up at trial, and I'm not going to allow them, meaning me, the government, to go through everything this fellow ever did in life on cross-examination on the fraud case, on the restaurant case. There was an invitation for the district court to go beyond just limiting instruction that you highlighted, Judge Wilkinson, but also to limit the government in its cross-examination. That time came at trial, and the defense never re-raised that issue, and yet here is asking this court to sort of look into this black box about what limitations could have been done, what sort of additional efforts the trial court could have taken to limit that prejudice, and just say instead, no, even without that information, my client should get a new trial. And so for that reason, I don't believe that it would be appropriate here to, even if this court were to find a misjoinder occurred, I do think the harmlessness applies in this case, and I don't believe that there was harm caused. Just to conclude very briefly on the sophisticated means question, Your Honors, unless you have any other further questions, we highlighted the chart government's, or rather defense exhibit 30 that was used during the cross-examination of a financial expert. I think that was used by the defense in an effort to just suggest that no one could understand what was going on here. Respectfully, this is not a case about just one or two accounts. It was a case about many accounts. Among other things, the defendant had access to his deceased mother's estate. He was taking cash out of that to infuse it into the pooled settlement account to sort of hide the fact that money was going through. And then the nature of the cardholder agreement, I think, is the sort of most distinguishing fact. When the FBI knocks on Mr. Lawrence's door in 2021, we have at that point the financial records, but he uses his sophisticated understanding and hides behind this financial language in the cardholder agreement. And to the average sort of juror, I think that would be something that was indecipherable, and that's why the government had to, and I think appropriately, call an expert to talk about that language. That alone brings this case out of sort of the realm of a regular wire fraud case. The trial court wasn't suggesting that everything that is not simply a robbery of a convenience store is sophisticated. His reasoning, although it was somewhat brief, talked at length about the different things that he had done. And again, unless your honors have any further questions, we'd rely on our brief and ask you to affirm the defendant's conviction. Do you have any further questions? Thank you. Thank you. Mr. Bryant, you have some rebuttal time. Could I ask you, because we didn't really touch on that, but your basic defense at the trial seemed to be that all this case was really about was a sort of civil breach of contract claim and that Mr. Lawrence did not engage in any sort of fraud, but what he did, this is really at the bottom just a case of poor business judgment, that he was out to make the best deal that he could in some way for the employees, and the investments just didn't turn out to be profitable. How could you make that case in light of this record? Well, I understand the court's concern. We've argued that a mere breach of contract is not necessarily a crime. We would all agree with that. Right, and so I think that's true even if you think that there is a risk that that might come up. So take, for example, if I take out a business loan to open a restaurant, a restaurant is a risky industry and a lot of restaurants fail, and so imagine that I've operated a restaurant for a decade, just like this business arrangement lasted for over a decade, and then the COVID pandemic hits and all of a sudden the restaurant's failing, I can't pay my staff, I can't pay my vendors and suppliers and rent and taxes, so I get kind of desperate and ultimately the business fails and I'm not able to pay my bills. That's a breach of contract for which there are civil remedies or maybe eventually bankruptcy, but it's not necessarily a crime even if I know that possibility might arise. And the one quibble that I'd like to have with something that the government said, Mr. Lawrence did not promise that he would only invest the funds in treasury-backed money market accounts. But what he told the employees, wasn't that a jury question? I don't think so if as a matter of law there's not a misrepresentation, and the representation he made was that the funds would be available and I will invest them in something that's short-term and liquid. So he couldn't invest, for example, in a CD. I thought the explicit representation was made to the employees that their funds were going to be used in a risk-free U.S. treasury-backed money market fund, which is about the safest kind of investment that one could ask for, and then instead of the safest kind of investment that one could want, what happened was it was put in the riskiest vehicle that one could possibly ask for, which is the kind of options trading that took place. And so you're talking about investments at the opposite ends of the risk spectrum, you see? Well, I do see what you're saying, but the words risk-free were not in the representation. All he said was that it would be liquid and available. It's no different than a bank, and if there's a run on the bank, the bank hasn't committed fraud. Just because everyone comes to ask for their deposits at the same time, if the bank hasn't made some necessary representation, that's why we have deposit insurance. I would like, since my time is winding down, to turn back to our severance and joinder issue. We're obviously not arguing structural error. I want to be very clear about that. But I do believe that there was harm here because it affected the trial strategy to such a degree that Mr. Lawrence was put in a position where he effectively had to concede the PPP fraud count, and yes, he did try to use that offensively to draw the distinction, but he wouldn't have had to do that if he was only on trial for the PPP fraud. He never would have conceded it. He only had to do that because it was joined with these other counts, and it created this risk that the jury would apply a propensity inference that, because he committed one fraud, he necessarily committed the other. Can you address the 404B point? Right. It seems like to me that if you were trying the PPP fraud, that you could put in maybe all of, but virtually all of, the evidence that came in during the employee fraud. Right. I was coming to that. I would have to think about it if we're sort of in this counterfactual. That's what we've got to do. I understand. I don't think I could deny that none of it would be relevant. I think that we certainly wouldn't have a week of evidence on that, with days and days and tracing every bit of this. All that would really be necessary was something of an overview to explain why he didn't have the money at the time. And that's why I would point back to the Hawkins case. Hawkins had a carjacking and a felon in possession, and so obviously the fact that he used a firearm in the commission of the carjacking might have been relevant or might have been 404B. But you haven't answered. I'm not sure that you've answered Judge Richardson's question. Because, I mean, how could it not be admissible if it goes so directly to motive and intention? If I can continue here. Sure. I'm not denying that there might be some relevance and some overlap. I'm just saying that it wouldn't be presented the same way. We wouldn't have this overview. But it would come in. Because of all the exceptions to general character evidence under Rule 404B, I would say motive and intent is probably the most common. That's why I think that, I mean, to me at least, Judge Richardson's question was a highly relevant one. I understand, and I'm not denying that there wouldn't be some overlap. But, again, I think I would point to the Hawkins case, which said that even where there is some overlap and even where there is a limiting instruction, there still are cases where it's not fair to ask the jury to parse those out. Even on the harmlessness point, we've been over it, and I don't want to repeat it, but we do have the amount of evidence that is introduced with respect even to this count, and the jury instructions under 404B issued down the road, and there's a lot to address. Well, I understand, Your Honor, and just for the reasons we stated in our brief, we disagree with that. And if I may, just one last point very quickly. I know the Court is aware that Mr. Lawrence sought to represent himself in this case. The Court denied that but did give him permission to file a pro se brief. We certainly, on his behalf, ask the Court to consider those arguments along with the ones that we've made and thank the Court for giving him that opportunity. Well, Steve, it's your Court of Assignment. From the Public Defender's Office. I think you did a fine job, and we'd like to come down and move on to the next case. We want to come down and shake hands with you. But I always, Mr. Bryan, I always tell people, if you're mad at me, you don't have to shake my hand.
judges: J. Harvie Wilkinson III, Julius N. Richardson, A. Marvin Quattlebaum Jr.